UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JANICE SORON,

                                        Plaintiff,

        vs                                              5:02-CV-1514

LIBERTY LIFE ASSURANCE COMPANY OF
BOSTON (a/k/a Liberty Mutual), FLEET
BOSTON FINANCIAL GROUP AND FLEET
BOSTON LONG TERM DISABILITY PLAN,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**U. S. DISTRICT COURT
N. D. OF N. Y.
FILED**

**MAY   2 2005**

AT _____ O'CLOCK _____ M
LAWRENCE K. BAERMAN, Clerk
UTICA

APPEARANCES:                            OF COUNSEL:

SAUNDERS, KAHLER & LOCKE, LLP           RAYMOND A. MEIER, ESQ.
Attorneys for Plaintiff
185 Genesee Street, Suite 1400
Utica, New York 13501

BOND, SCHOENECK & KING, PLLC            BRIAN J. BUTLER, ESQ.
Attorneys for Defendant Liberty Life
    Assurance Company of Boston
One Lincoln Center
Syracuse, New York 13202-1355

EDWARDS & ANGELL, LLP                   GEORGE P. KOSTAKOS, ESQ.
Attorneys for Defendants Fleet Boston
    Financial Group and Fleet Boston Long
    Term Disability Plan
2800 Financial Laza
Providence, Rhode Island 02903

DAVID N. HURD
United States District Judge

## MEMORANDUM DECISION and ORDER

## I. INTRODUCTION

Plaintiff Janice Soron ("Soron" or "plaintiff") worked as a training coordinator/supervisor for defendant Fleet Boston Financial Group and Fleet Boston Long Term Disability ("Fleet").  She purchased disability insurance through Fleet from Liberty Life Assurance Company ("Liberty").  Soron filed this action in December of 2002, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001, challenging the denial of her claim for long term disability ("LTD") benefits.  Pursuant to Fed. R. Civ. P. 56, defendants moved for summary judgment and plaintiff cross-moved for the same.  Oral argument was heard on February 11, 2005 in Utica, New York.  Decision was reserved.

## II. FACTS

Plaintiff was employed by a subsidiary of Fleet during various periods from November 4, 1985, to November 15, 2001.  She was a covered employee under a disability insurance  policy administered and payable by Liberty.

In September 1999, plaintiff was approved for short term disability benefits based on the onset of symptoms of rheumatoid arthritis.  In January of 2000, Liberty requested that Fleet complete a Physical Job Evaluation Form listing the various requirements of plaintiff's job.[1]  Plaintiff's position was referred to by different titles through the claim processing, but seems to be settled as "training coordinator."  According to the form completed by Fleet, plaintiff's job duties consisted of:

---

[1]   Plaintiff's employer is otherwise referred to as AFSA Data Corporation, which is a subsidiary of Fleet, and is the name listed on the form.  Admin. Rec. at 172.  The same form, relating essentially the same information, names her employer as Fleet Financial later in the record.  Admin. Rec. at 559.

| | | | |
|---|---|---|---|
| Planning, scheduling and organizing training delivery | | 1-2 hrs./day | |
| Supervising, coaching, evaluating trainer performance | | 2 hrs./day | |
| Oversees development of training programs | | 1 hr./day | |
| Prepares written reports of above | | 2-3 hrs./day | |
| Meetings | | 1-2 hrs./day | |

The physical requirements were listed as follows

| | | | |
|---|---|---|---|
| Sitting | 70% | Reaching | 30% |
| Lifting | 10% | Bending | 10% |
| Walking | 10% | Standing | 20% |
| Climbing | 1% | Typing | 30% |

Stooping, squatting and traveling were not required.  The lifting requirement was recorded as less than ten pounds.  Plaintiff commuted one hour each day.  (Admin. Rec. at 559.)

Fleet also noted that "[t]he urgency of [the] changing training schedules requires flexibility and ability to handle lots of stress. The Coordinator generally works 9 -10 hrs./day." Id.  Plaintiff disputes Fleet's allocation of 30% of her time spent walking and standing.  She asserts she was frequently required to move about a large facility to witness, coordinate and conduct training.(Admin. Rec. at 695.)

On March 12, 2000, plaintiff's short term benefits expired and she applied for LTD benefits which provide a participant with 24 months of benefits if, inter alia, she is "unable to perform all of the material and substantial duties of [her] [own] occupation on an Active Employment basis because of an Injury or Sickness."  (Docket No. 32, Ex. A, § 2.)  In support of the application, plaintiff submitted notes from her treating physician, Dr. Ute Dreiner, that indicated she had rheumatoid arthritis, and was completely disabled from performing the essential duties of her position.  Dr. Dreiner describes plaintiff's medical condition as follows:

> [Plaintiff] has a well documented diagnosis of seropositive rheumatoid
> arthritis as evidence by symmetrical polyarthritis, positive rheumatoid

> factor, a positive ANA, histolic features positive for rheumatoid arthritis from a synovectomy of her right wrist and evidenced on hand x-rays by periarticular osteopenia.

(Docket No. 32, Ex. B, Administrative Record, p. 734) ("Admin. Rec. at __")

Over the course of handling plaintiff's claim, Liberty retained and consulted with a total of five doctors.  The first, Dr. Donald Abbott, was retained to review the initially submitted medical records.  On April 18, 2000, he issued a report questioning the basis for the rheumatoid arthritis diagnosis on the submitted records, and recommended another opinion by a rheumatologist.

On June 20, 2000, Liberty informed plaintiff that her application for LTD  benefits was denied.  As support for the decision, the letter stated that "[t]he office treatment notes received from September 1999 through April 2000 from [Dr. Dreiner] have been reviewed by a MD in our managed disability services department," who along with "the claims department" concluded "that there was not sufficient objective medical information supporting total and permanent disability."  (Admin. Rec. at 70.)

In July 2000, plaintiff requested that Liberty reconsider its determination.  In support, plaintiff submitted extensive narratives from both herself and Dr. Dreiner detailing her condition and symptoms.  Dr. Dreiner stated:

> It is my professional opinion that it is in Mrs. Soron's best interest not to resume any gainful full-time employment.  Her stamina and endurance is so low and her requirements for rest and sleep so high that I cannot conceive a work setting where she could function reliably. . . . In my opinion Janice Soron is and will always remain totally disabled due to active rheumatoid arthritis.

(Admin. Rec. at  256.)

In October of 2000, Liberty scheduled a independent medical examination ("IME") for plaintiff with Dr. Ze've Weitz, a rheumatologist, and the only doctor retained by Liberty who actually examined plaintiff.  He diagnosed plaintiff with "rheumatoid arthritis with low-grade activity" and a "[s]econdary diagnosis [of] fibromyalgia." [2]  (Admin. Rec. at 438.)  Dr. Weitz stated that "there is no evidence of an acute significant inflammatory arthritis.  Most of her complaints are probably due to the secondary fibromyalgia."  Id.   Dr. Weitz opined that plaintiff was "disabled from her usual line of work, which include[d] using a keyboard and standing long hours on her feet."  Id.

In early December 2000, Liberty informed plaintiff that although it needed additional information to determine her eligibility, it was granting her LTD benefits retroactive to March 12, 2000, and continuing payments until its processing of her application was completed.  Also during December 2000, Liberty received the first of three investigative reports from a private surveillance firm it had engaged to videotape and document plaintiff's physical activities.  (Admin. Rec. at 523.)

---

[2] "'Fibromyalgia' is 'a common and chronic disorder characterized by widespread muscle pain, fatigue, and multiple tender points.' See National Institute of Arthritis and Musculoskeletal and Skin Diseases, Questions and Answers about Fibromyalgia, at http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm.'" Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 291 (2d Cir. 2004).  The website also explains that

> [t]here are currently no diagnostic laboratory tests for fibromyalgia. . . Although fibromyalgia is often considered an arthritis-related condition, it is not truly a form of arthritis (a disease of the joints) because it does not cause inflammation or damage to the joints, muscles, or other tissues. Like arthritis, however, fibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities.

At Liberty's request, plaintiff underwent a transferrable skills analysis ("TSA") and a functional capacity evaluation ("FCE"). In the TSA, it was noted that another medical peer review was undertaken at Liberty's request. In January of 2001, Dr. Tanya Lumpkins opined that plaintiff could perform her job with the following restrictions: "No heavy lifting greater than five pounds. Standing and walking limited to less than one mile cumulative over 24 hours and sitting or standing not to exceed two hours at a time. Keyboard entries should include rest breaks for every thirty minutes of work." (Admin. Rec. at 743.)

The physical therapist who performed the FCE concluded on April 12, 2001, that plaintiff was:

> functioning in the sedentary work classification category for an 8 hour period. Ms. Soron's functional abilities are limited by her physical limitations of decreased ROM and strength and bilateral upper extremities . . .[P]ain and stiffness with appropriate physiological responses [were] noted.

(Admin. Rec. at 483.) She indicated that plaintiff demonstrated a tolerance of walking, standing, stair climbing, overhead reaching, forward reaching, pushing/pulling, crawling, kneeling, stopping and crouching on an "occasional" basis, and a tolerance of sitting, trunk bending, squatting, and trunk twisting on a "frequent" basis. Id. The FCE report states that her employer requires "frequent" writing but she can only perform at the "occasional" level. (Admin. Rec. at 488.) In addition, her position requires "constant" sitting and she can only sit for durations in the "frequent" range. Id.

On May 12, 2001, and July 18, 2001, after videotaping and documenting surveillance on plaintiff, the private firm engaged by Liberty issued its second and third reports. Plaintiff was observed shopping, carrying a pizza box, hoeing or raking her garden,

and assisting in lifting a lawn mower.  She was observed in sustained activity for more than

four hours and for three consecutive days.

At Liberty's request Dr. Gale Brown, Board certified in internal medicine and

physical medicine and rehabilitation, reviewed plaintiff's medical records and documentation,

and issued a report on October 1, 2001, regarding whether plaintiff was disabled from

performing her job functions.  Dr. Brown found that the "medical evidence substantiat[ed]"

the rheumatoid arthritis diagnosis, and noted that plaintiff's "symptomatic complaints

correlate with objective medical documentation related to her musculoskeletal condition."

(Admin. Rec. at 403.)  However, she believed that FCE and the surveillance tapes

demonstrated an objective functionally capacity consistent with at least sedentary work.

Dr. Brown stated that the record supported that plaintiff could perform the essential

duties of her position but noted limitations and potential accommodations that might be

required, including:

> No frequent or constant standing/walking, as this can increase
> symptoms involving the joints of the feet, ankles and knees.
> No frequent or constant repetitive wrist and hand work, including fine
> manual dexterity, as this can increase symptoms related to joint disease
> affecting the fingers and wrists.
> Position changes as necessary for comfort, to prevent undue joint
> stiffness.  Use of wrist splints as necessary for comfort and joint protection
> during acute flare ups.
> . . .
> Should substantial amounts of repetitive handwork be required, this claimant may
> require accomodative device, such as a voice activated computer.

(Admin. Rec. at 404.)  As support for her conclusion, Dr. Brown cited, inter alia, Dr. Dreiner's

opinion and physical exam findings, a formal job description and the medical exam

performed by Dr. Weitz.

On October 18, 2001, Liberty informed plaintiff it was again denying her LTD benefits claim. The letter cited plaintiff's medical record, Dr. Brown's report, the FCE, and a portion of Dr. Weitz's report as support for its conclusion. Liberty determined that the "objective functional documentation" and the medical documentation did not substantiate her disability claim. (Admin. Rec. at 443-445.) At the time of this denial, five months remained of the 24 month "own" occupation period. The denial meant that plaintiff was precluded from applying for continued LTD benefits as disabled from "any" occupation. It also triggered termination of plaintiff's employment which ended her entitlement to other employee benefits. Plaintiff appealed the decision.

On March 23, 2002, plaintiff's file was reviewed by Dr. Richard Herman, a family practitioner. He reviewed the correspondence and records from plaintiff and Dr. Dreiner, Dr. Brown's review, Dr. Weitz's report, Dr. Abbott's review, the FCE, the TSA, and the three surveillance reports. Dr. Herman noted that "[t]here is little debate as to whether or not [plaintiff] has Rheumatoid Arthritis," and a general consensus among all medical professionals, with the exception of Dr. Dreiner, that plaintiff could return to work, but "she should not do repetitive hand activity based on the fact that she has decreased grip strength, and that she should not do prolonged standing based on her reported symptoms in her knees and ankles." (Admin. Rec. at 394.) He also stated that plaintiff had some components of fibromyalgia. He also noted that:

> [a]ddressing the fatigue and stamina issue is a little more difficult to do because it is hard to measure. On an Activities Questionnaire claimant stated that she had limited stamina and was very stiff in the morning and could only do limited house work. She also required naps and needed to sleep more than 10 hours. However, the conclusion of the FCE carried out by a Certified Physical Therapist was that claimant had the stamina to work an eight hour day. In addition, the surveillance video shows a

- 8 -

woman who is up and out of the house for three days in a row.  She
shows no evidence of fatigue, in fact has rapid gait at time, and is even
seen doing some gardening.  This is not the picture one would expect of
the woman who has a chronic disease which supposedly limits her
stamina.  In fact the discrepancy between claimant's reporting of her own
activities and the video tape raises questions about the claimant's
credibility in reporting her own symptoms.

(Admin. Rec. at 394.)  Dr. Herman concluded that plaintiff "would appear to have the stamina

to work forty hours a week in a sedentary occupation."  (Admin. Rec. at 395.)

One week later, by letter dated April 1, 2002, Liberty reaffirmed its conclusion that

plaintiff was not eligible for LTD benefits.  In arriving at its decision Liberty "reviewed the

medical information from [plaintiff's] physician(s), an [FCE], independent medical peer review

reports[,] [and] then compared [her] restrictions and limitations outlined in the medical

information to the requirements of [her] occupation of Training Specialist."  (Admin. Rec. at

397.)

In December 2002, plaintiff commenced the instant action alleging that Liberty

wrongfully denied her LTD claim.  Both plaintiff and defendants moved for summary

judgment and plaintiff prevailed on the narrow ground that Liberty had not provided a full and

fair review process.  Specifically, Liberty had failed to disclose the evidence underlying its

decision to deny plaintiff LTD benefits.  The action was remanded to Liberty's administrative

process for a proper review. The summary judgment motions were dismissed without

prejudice with leave to file again after the administrative decision.  See Soron v. Liberty Life

Assur. Co., 318 F. Supp. 2d 19 (N.D.N.Y. 2004).

On remand, plaintiff submitted a letter from her counsel outlining her legal

arguments, a letter and affidavit of her own, an affidavit and report from a rehabilitation

counselor, and a letter report from Soron's treating physician, Dr. Dreiner.  Plaintiff's affidavit

addressed the doctors reports, disputed the specific requirements of her job as related by her employer, and the surveillance videos.  (Admin Rec. at 692).

Peter Stickney, a certified rehabilitation counselor reviewed, inter alia, the FCE and the physical job evaluation form and pointed out several inconsistencies in Liberty's determination that plaintiff could work as a Training Coordinator.  Stickney pointed out that Liberty had not addressed plaintiff's capacity to meet the frequent fingering and handling requirements of the job.  The FCE report that states she could do "occasional" writing, but the job requires "frequent" writing.  And "[t]o the extent that typing and reaching requirements extend into the "frequent" range, she would not be able to perform her job activities as these activities seem to comprise substantial and essential elements." (Admin. Rec. at 718.) Stickney pointed out that the FCE also states that she can work in a sedentary position for 8 hours per day but the job evaluation form lists her job as requiring 9 -10 hours per day. Finally, Mr. Stickney took issue with Liberty's TSA comparison of plaintiff's occupation with jobs he considered light capacity because the FCE states that plaintiff only has the capacity to perform in a sedentary occupation.  (Admin. Rec. at 719.)

The letter submitted by Dr. Dreiner reiterated the objective evidence that supports the diagnosis of arthritis and addressed numerous issues with the claim file, two of which will be noted here.  (Admin. Rec. at 739.)  First, Dr. Dreiner disagrees with Dr. Weitz's diagnosis of fibromyalgia, which was then acknowledged, and to some extent concurred with, by the reviewing doctors.  Dr. Dreiner states that fibromyalgia is not clinically significant or relevant in plaintiff's case, but that fatigue is a large part of rheumatoid arthritis and attributes plaintiff's pain and exhaustion to the arthritis.  (Admin Rec. at 736.)  Both doctors credit the

plaintiff's complaints of pain and fatigue but apparently attribute her symptoms to different

causes. Nonetheless, Dr. Dreiner noted that:

> [i]t takes an in depth understanding of the disease process of rheumatoid
> arthritis and years of experience working with patients to understand how
> chronic joint pain and fatigue limits ones ability to function.  Measures of
> rheumatoid disease activity do not only include the number of swollen or
> red joints, or the height of sedimentation rate, they also include duration of
> mourning stiffness which Mrs. Soron measures in hours, the number of
> tender joints [of] which she always has many and exam and also fatigue.
> It is Mrs. Soron's misfortune in her disability claim that fatigue cannot be
> objectively measured. . . I believe it is due to a similar background in
> training that both the independent medical examiner, Dr. Weitz, a
> rheumatologist, and I concur that Mrs. Soron is disabled.

(Admin. Rec. at 734.)

Second, Dr. Dreiner made a point of discussing the physical effects of plaintiff's

participation in the FCE on April 12, 2001.  Dr. Dreiner reported that plaintiff suffered

immediately and intensely, to some extent for weeks, and she required additional pain

medication after participating in the evaluation.  She also added:

> Most troubling in the FCE was Mrs. Soron's reported pain in wrists and
> finger soreness, pain levels at 7 over 10 after the therapist noted objective
> redness in the right hand more than the left after typing and writing.  Also
> stabbing pain about the wrist and burning in the fingers.

 (Admin. Rec. at 735.)

Liberty also added to the administrative record on remand.  It added another peer

review of plaintiff's records by Dr. Alan Marks, certified in Internal Medicine and

Rheumatology, and an occupational analysis by an independent vocational consultant.

Liberty's final determination relied heavily on Dr. Marks' review of the administrative

record and so it is necessary to relate his findings in some detail.  Dr. Marks verified the

diagnosis of rheumatoid arthritis, but concluded that plaintiff was not impaired enough to be

considered disabled from her occupation.  (Admin. Rec. at 628-633, 667-670.) [3]  Dr. Marks'

reluctance to accept that the arthritis limited plaintiff's capacity to work is due to the fact that

the extent to which plaintiff suffers from the disease is self-reported and based on subjective

evidence.  He found that "[p]laintiff's self reported limitations are not supported by any of the

information in this review."  (Admin. Rec. at 669.)  While not impermissible or necessarily

problematic, Dr. Marks is clearly skeptical of plaintiff's subjective complaints:  "The treating

rheumatologist has marked her disabled because she has basis [sic] told him she cannot

work, because she was tired and achy all over."  Id.

        Dr. Marks acknowledged that Dr. Weitz did deem plaintiff disabled from her own

occupation, but simply disagreed with him.  He agreed with Dr. Brown and Dr. Herman's peer

reviews to the extent of their diagnosis of plaintiff's condition, but he did not acknowledge

that plaintiff suffers any limitations.

> Based on the examinations, and considering the fact that the patient has
> a sedentary job, this patient would bear no physical restrictions and
> limitations at work due to her rheumatoid arthritis.

(Admin. Rec. at 668.)

        Dr. Marks acknowledged the diagnosis of fibromyalgia, that it is difficult to

document, and that the symptoms plaintiff complains of support the diagnosis. Id.   He

concludes by noting, without any particularity, that her job is sedentary and that the

surveillance video supports his conclusion that plaintiff is more than capable of sedentary

work: "The surveillance does not indicate in any way shape or form that this woman is

exhausted and homebound."  (Admin. Rec. at 630.)

---

[3]  The report is actually in two parts as Liberty found it necessary to ask Dr. Marks to address some
discrepancies in his first report.

In October 2004, Liberty issued its decision and again denied plaintiff benefits.  As noted above, the decision relies on Dr. Marks' report to determine plaintiff's medical status. Liberty also considered the job requirements with which to compare plaintiff's physical capacity.  The decision lists Stickney's criticisms of Liberty's characterization of plaintiff's job as sedentary and acknowledges the conflicting characterizations of plaintiff's occupation in the claim file.

> [A] discrepancy existed between the [Department of Labor's Dictionary of Occupational Titles ("DOT")] occupational description (specifically the physical demands) for Technical Training Coordinator and the Physical Job evaluation form completed by [plaintiff's employer].  The DOT indicates that physical demands would be considered light work with frequent reaching, handling and fingering.  The employer indicates the physical demands would be considered sedentary work with occasional reaching and typing.

In order to resolve the conflict, Liberty retained a vocational consultant to conduct an independent occupational analysis.  Mary Paine O'Malley, conducted a labor market review within banks and financial institutions nationwide to clarify the physical demands of plaintiff's occupation.  After surveying fifteen such employers, it was determined that the occupation was sedentary, required occasional reaching, handling, fingering, keyboarding, typing and writing, and provided the opportunity to change positions as needed.  (Admin. Rec. at 647)  Liberty, satisfied that the market survey addressed Mr. Stickney's concerns, compared this determination to the medical review of Dr. Marks and concluded that plaintiff did not meet the definition of disability from her own occupation. (Admin. Rec. at 624).

The pending summary judgment motions followed Liberty's determination.

III. **DISCUSSION**

   A. **Summary Judgment Standard**

   Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505 (1986); Richardson v. N.Y. State Dep't of Correctional Servs., 180 F.3d 426, 436 (2d Cir. 1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.  Ct. 1348 (1986).

   Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; Anderson, 477 U.S. at 250. At that point, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec., 475 U.S. at 586. Indeed, to withstand a summary judgment motion, the nonmoving party must demonstrate that sufficient evidence exists upon which a reasonable jury could return a verdict in its favor. Anderson, 477 U.S. at 248-49; Matsushita Elec., 475 U.S. at 587.

   B. **Standard of Review under ERISA**

   ERISA is silent as to the standard of review to be applied to administrators' benefit determinations.  Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir. 2003). The Supreme Court, however, has held that challenges to denials of benefits are "to be reviewed under a de novo standard unless the benefit plan gives the administrator

or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan."
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948 (1989).  "Where a
written plan confers upon an administrator the discretionary authority to determine eligibility,
a court must view its decisions with a 'strong measure of deference' and may reverse only if
the administrator's ultimate conclusions are 'arbitrary and capricious.'"  Armstrong v. Liberty
Mut. Life Assur. Co., 273 F. Supp. 2d 395, 402 (S.D.N.Y. 2003) (quoting Pagan v. NYNEX
Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995)).  The parties do not dispute that the arbitrary
and capricious standard applies in the instant case.

   "Because review in this context is limited to the record before the administrator at
the time of decision, however, 'the district court sits in effect an as appellate court to
determine whether the denial of ERISA benefits was arbitrary and capricious.'"  Henar v. First
Unum Life Ins. Co., No. 02-CV-1570, 2002 U.S. Dist. LEXIS 17585, 13-14 (S.D.N.Y. Sept.
19, 2002) (quoting Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862 F.
Supp. 783, 791 (E.D.N.Y. 1994).  A decision or interpretation is arbitrary and capricious if it is
"without reason, unsupported by substantial evidence or erroneous as a matter of law."
Pagan, 52 F.3d at 442.  The administrator's decision is reviewed to determine whether it
"was based on a consideration of the relevant factors and whether there has been a clear
error of judgment."  Armstrong, 273 F. Supp. 2d at 403 (citing Jordan v. Retirement Comm.
of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995)).  "'Substantial evidence'
is 'such evidence that a reasonable mind might accept as adequate to support the conclusion
reached by the [decision maker and] requires more than a scintilla but less than a
preponderance.'"  Id. (citing Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir.
1995)).

> [A]lthough limited, review of a determination under the arbitrary and
> capricious standard is more than an perfunctory review of the factual
> record in order to determine whether that record could conceivably
> support the decision to terminate benefits. Rather, such a review must
> include a "searching and careful" determination as to whether the
> conclusion reached by the administrator in view of the facts before it was
> indeed rational and not arbitrary.

Rizk, 862 F. Supp. at 789.  It would be arbitrary, and not an exercise of good faith if a

fiduciary knew of matters "which honesty would require investigation, and failed to act, or if it

knew of matters which would honestly compel a given determination and it announced to the

contrary."  Id. (quoting Colket v. St. Louis Union Trust Co., 52 F.2d 390, 395-96 (8th Cir.

1931)).

### C.  Denial of Benefits

Defendant moves for summary judgment asserting that its decision was a

reasonable determination of the facts based on evidence in the record and supported by

substantial evidence.  Plaintiff cross-moves for summary judgment arguing that Liberty's

determination that plaintiff was not disabled was arbitrary and capricious in that it is an

unreasonable interpretation of the record.  Since plaintiff's diagnosis of rheumatoid arthritis

was not at issue, the initial question before Liberty was whether plaintiff's subjective

complaints supported the claimed severity of her medical condition.  Two, somewhat

intertwined, aspects of Liberty's determination are at issue.  First, plaintiff argues that Liberty

was unreasonable in requiring more objective evidence of her condition, or rather, in

discounting her subjective complaints of pain and fatigue.  Second, the related issue is

whether Liberty was unreasonable in crediting the opinions of the non-examining, peer

reviewing physician's over the opinions of plaintiff's treating physician and an independent

medical examiner.

Since Liberty relied on Dr. Marks' report, plaintiff begins by pointing to what she sees as both factual errors and weak reasoning in the report.  Liberty's decision refers to five doctors in total, and Dr. Marks' report is in at least some conflict with the four other doctor's views.  He doesn't just disagree with the treating physician and the IME that plaintiff is disabled, but also with the peer reviews to the extent that they acknowledge plaintiff's suffering some limitations due to her disease.[4]  The fact that Liberty relied on the medical opinion on the farthest end of the spectrum of opinions despite its weaknesses is not necessarily arbitrary and capricious.  However, in this case, adopting its particular interpretation of the record is arbitrary and capricious.

### 1. Objective and Subjective Evidence

There is a consensus that plaintiff has rheumatoid arthritis.  She also suffers with some level of pain and fatigue which is attributable to either the arthritis itself or components of fibromyalgia.  Neither Liberty nor any of the reviewing doctors discuss what effect plaintiff's pain and fatigue would have on her ability to perform her occupation.  But Dr. Dreiner noted that plaintiff:

> has to take a rest every day, sometimes even a nap and again she requires 12 hours or more of sleep at night.  She frequently interrupts her household activities with breaks of 15 minutes or more.

(Admin. Rec. at  256).  If true, plaintiff's low stamina and rest requirements would certainly preclude her from performing her occupation.  In essence, if plaintiff's self-reported

---

[4] Curiously, the more times plaintiff is examined or reviewed the better her medical condition gets.  Diagnosed in 1996 and treated for three years, plaintiff's treating rheumatologist, Dr. Dreiner, essentially concluded that plaintiff was disabled from "any" occupation.  The first doctor hired by Liberty to do an independent medical examination, Dr. Weitz, found her disabled at least as to her "own" occupation.  The peer reviews by Dr. Brown and Dr. Herman, not actual examinations, concluded she's not disabled but note that she suffers limitations.  But the final peer review, by Dr. Marks, found that even though she has the disease, she isn't limited by it, she's just reporting that she is.

- 17 -

complaints are believed, she would be disabled from her occupation.  Plaintiff would be unable to sustain even a clearly sedentary position 40 hours a week due to her pain, fatigue, and lack of stamina.

Both the physical requirements of her job in terms of handwork and her ability to perform them according to the FCE fall somewhere in the gray area between sedentary and light capacity work.  It appears that the occupation is sedentary with light capacity components.[5]  Liberty recognizes that this is a case where the severity of the disease is at least to some extent measured by subjective reporting.  However, in reliance on Dr. Mark's report, Liberty discounted plaintiff's subjective complaints and was thus able to determine that she was not disabled.  But for plaintiff's subjective complaints of pain and fatigue, Liberty's decision would fall into a range of permissible inferences supported by the record.  But to accept Liberty's determination is to accept Liberty's reasoning in totally discounting plaintiff's subjective complaints and that decision is not supported by the instant record.

Defendants cite Maniatty v. UNUMProvident Corp. for the proposition that it is not unreasonable for a plan to require objective evidence.  218 F. Supp. 2d 500, 504 (S.D.N.Y.2002)).  In Maniatty, the court noted that "the very concept of proof connotes objectivity."  Id.  The court upheld the denial of benefits in Maniatty.  Plaintiff suffered from back problems but the only evidence in the record before the administrator was the treating physician's recognition of the plaintiff's complaints.

Plaintiff argues that there is sufficient objective evidence in the record, but also notes the Second Circuit's acceptance of subjective evidence or self-reported symptoms to

---

[5] However, even if it was clearly "sedentary", the FCE indicates that plaintiff cannot sit for as long as the position requires and she cannot perform the required writing requirement.

support disability claims when they are believed.  See Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127 (2d Cir. 2001); Chan v. Hartford Life Ins. Co., No. 02-CV-2943, 2004 U.S. Dist. LEXIS 17962 (S.D.N.Y. Sept. 8, 2004).  Plaintiff asserts that it was unreasonable not to credit plaintiff's self-reported symptoms in this case.  Unlike Maniatty, in this case, an IME credited plaintiff's complaints.  Interestingly, it is also noted that all three doctors relied on by Liberty recognized that plaintiff suffered from fibromyalgia without ever acknowledging that the only thing that could support that diagnosis was plaintiff's self-reported symptoms.

Dr. Marks, Dr. Brown, and Dr. Herman all state that subjective evidence, like a patient's report of pain, is difficult to measure, but that in this case they are able to discount plaintiff's complaints because of contradicting "objective functional evidence" and refer to the surveillance tapes and FCE.  Liberty also relied on this evidence.  As explained in its decision,  "constitutional symptoms of fatigue and poor stamina. . . cannot easily be measured which is why attention must be directed towards FCE and surveillance video."  (Admin. Rec. at 662.)  However, neither source of information can be considered substantial evidence to discredit plaintiff's reports of pain and fatigue.

Beginning with the surveillance tapes, neither plaintiff nor her doctor claim that she cannot perform tasks for a short period of time or, on good days, any of the activities shown on the surveillance tapes.  (Admin. Rec. at 454 - 57, 737.)  Nor is it necessary for plaintiff to demonstrate complete incapacitation, or being homebound, to demonstrate disability under the "own" occupation definition in her policy.  She only needs to be unable to perform the substantial and material duties of her occupation which requires at least 40 hours a week in an environment which, however flexible, constrains her physical movements at the same

time it requires fine fingering work.  She claims that she lacks the stamina to work full-time and is sometimes incapacitated for long periods after short periods of exertion.

The surveillance video cannot be relied on to contradict this reporting because it shows her performing isolated activities for brief periods of time with no revelation of the consequences.  See Winter v. Hartford Life & Accident Ins. Co., 309 F. Supp. 2d 409, 415 (E.D.N.Y. 2004) (refusing to allow similar tapes, standing alone, to constitute substantial evidence to support the denial of LTD benefits in a back and neck injury case); Chan v. Hartford Life Ins. Co., 2004 WL 2002988, at *26 (S.D.N.Y. 2004).  As Dr. Dreiner explained, and Liberty never addressed,

> [p]atients with rheumatoid arthritis under treatment in this day and age are rarely bed ridden and homebound.  They are able to engage in moderate degrees of activity on their good days, but what a hidden camera hidden in the bushes cannot document is how much discomfort the patient has after these activities, how much time is spent on the couch afterwards, and what amount of pain medication or anti-inflammatory medication is required to manage symptoms.

(Admin. Rec. at 737).

Plaintiff also claims that she is unable to perform the hand work required in her position.  If her reports of joint pain in her wrists and hands are believed then she would be unable to perform the fine fingering work her position required.  To whatever extent the observed activities counter plaintiff's complaints of fatigue and reduced stamina, it is difficult to discern what the videotaped activities add to the dispute about the handwork required in her occupation and plaintiff's capacity to perform it.  Even the observed hoeing/raking activity does not reflect the fine finger movements involved in writing, typing, and handling papers.

Turning to the FCE, Dr. Brown, Dr. Herman and Dr. Marks relied on the physical therapist's conclusion that plaintiff demonstrated the ability to perform sedentary work eight

hours per day.  During the FCE on April 12, 2001, plaintiff completed, <u>inter</u> <u>alia</u>, a 12 minute

treadmill test at 2.3 miles per hour, that resulted in sore hips knees and ankles.  However

plaintiff performed on the day of the evaluation, Dr. Dreiner reported on remand that:

> [during t]he next office visit after the [FCE on] June 20, 2001[,] Mrs. Soron
> reported that she had a terrible time after the [FCE].  She didn't start
> feeling better until the third week in May.  I had to call in a four day burst
> of Prednisone on April 13 for the flare of her disease that was triggered by
> the tasks she had to perform for the [FCE].  A generous dose of pain
> medication, Tramadol, 100 mg. four times a day did not even help the
> pain.  She was complaining of knee pain, pain in her feet, her wrists, her
> hands, stiffness with prolonged sitting, stiffness in the morning until 10:00
> am and in her hands practically all day.  Even at that, on June 20, when
> she started to feel better, she found that she needed a day of rest after
> overdoing.  It was on this visit, June 20, that we felt the Methotrexate was
> no longer adequate and Avara was added at 20 mg per day.

(Admin. Rec. at 735.)  Plaintiff's physical response to the FCE seems to be substantial

evidence of the disability of which plaintiff complains.  It's one thing for Liberty to determine

that this evidence, and its combination with other facts in the record is not substantial enough

to outweigh what its sees as evidence that she is not disabled, but it is another thing for

Liberty and Dr. Marks to rely on it to discredit plaintiff's self-reporting of symptoms.

Furthermore, one should question whether this information would have effected the medical

conclusions of Dr. Brown and Dr. Herman who did credit plaintiff's complaints enough to

recognize at least some occupational limitations.

On the instant record, neither the surveillance videos nor the FCE constitute

substantial evidence that plaintiff's self-reported symptoms are not as severe as she claims.

### 2. Examining and  Reviewing Physicians

Plaintiff raises the issue of whether Liberty was arbitrary and capricious in relying

on the reports of doctors who conducted peer reviews of plaintiff's claim file as opposed to

her treating physician and the only other examining physician, the IME provider.  The

Supreme Court made it clear in Black & Decker Disability Plan v. Nord, that the treating

physician rule which requires administrators to give special deference to a claimant's treating

physician, while applicable in Social Security benefits determinations, does not apply in

ERISA cases.  538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003).  However, it also noted that

"[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable

evidence, including the opinions of a treating physician."  Id.

     Black & Decker simply eliminates the special deference given to treating physician's

opinions.  It does nothing to alter the standards of reasonableness in weighing conflicting

medical opinions.  The factors for logically weighing such opinions, as articulated in 20

C.F.R. § 404.157(d)(2), are uneffected and remain instructive.[6]  Durr v. Metropolitan Life Ins.

Co., 15 F. Supp. 2d 205, 213-214 (D. Conn. 1998) (applying factors);  Karanda v. Conn.

Gen. Life Ins. Co., 158 F. Supp. 2d 192, 205-206 (D. Conn. 2000).  Black & Decker also

does not suggest anything that negates the inference that independent examining physicians

would, absent some particular reason, logically be afforded more deference than physicians

who perform paper reviews.

     Dr. Dreiner is a specialist in rheumatoid arthritis who treated plaintiff for three years

prior to deeming her disabled from any occupation.  Dr. Weitz, another rheumatologist and

an independent medical examiner, agreed that plaintiff could not perform her occupation.

---

    [6] "In determining whether to give a treating physician's opinion substantial weight over a non-treating
physician's opinion, a court should weigh the following factors: '(1) the frequency of examination and the
length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the
opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; (v) other
relevant factors." Durr, 15 F. Supp. 2d at 213 (citing 20 C.F.R. § 404.1527(d)(2) - (6))."' Karanda, 158 F.
Supp. 2d at 205.

Liberty weighed these opinions against the non-examining peer reviews of three doctors, one a family practitioner, who relied on the surveillance video and FCE.  Furthermore, while weighing these opinions Liberty was aware of the physical effects of the plaintiff's participation in the FCE and that two out of the three doctors it was relying on did not have that information.  Therefore, Liberty's determination was arbitrary and capricious.

Defendants cite several cases to demonstrate the extent of the deference afforded administrative decisions under the arbitrary and capricious standard.  None of the cited cases persuasively address the particular facts of this case.  In Armstrong v. Liberty Mut. Life Assur. Co., the plaintiff worked as an Executive Sales Representative who suffered limitations, pain and discomfort due to back and neck problems. 273 F. Supp. 2d 395, (S.D.N.Y. 2003).  As with the instant case the administrative decision was reviewed under the arbitrary and capricious standard, but the definition of disability was broader under Armstrong's particular policy than plaintiff's.  It provided for benefits where the insured was not only precluded from his own occupation, but also from "any other occupations for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." Id. at 404-05.

Armstrong's treating physician considered him disabled from all work but the FCE reported that he could perform jobs at a "medium" physical capacity demand level. Id. at 400.  This was a significantly different view of his restrictions and an IME agreed with the peer reviewers the treating physicians restrictions were excessive. Id.  The IME in this case actually credited plaintiff's complaints and agreed with the treating physician that plaintiff is disabled from her occupation.  Apparently, Armstrong's subjective reports of pain to the FCE

- 23 -

evaluator were coupled with comments about how he was "perfectly happy to stay at home, collect disability and watch his children play in sporting events." Id. at 406.

In Wojciechowski v. Metropolitan Life Ins. Co., the plaintiff was a customer operations manager who suffered neurological problems which interfered with his use of computers.  75 F. Supp. 2d 256, 259 (S.D.N.Y. 1999).  Reviewed under the arbitrary and capricious standard, plaintiff's condition was compared to the requirements of his own occupation and "any other gainful occupation for which [he was] reasonably fit by [his] education, training or experience." Id. at 258.  The administrative record included the reports of six physicians, three finding plaintiff disabled; and three, retained by the insurance provider, who didn't.  While the case may stand for the proposition that administrators are free to discount treating physicians' opinions in relation to those retained by insurance providers, the case is distinguishable because two of the three physicians retained by the insurance company actually examined plaintiff.  Id. at 259.

In Wagner v. First Unum Life Ins. Co., plaintiff worked as an international securities market analyst and suffered severe allergic reactions which she claimed prevented her from traveling as her occupation required.  No. 02-CV-9135, 2003 U.S. Dist. LEXIS 14245 (S.D.N.Y. Aug. 13, 2003).  Wagner was denied LTD benefits after which she objected to the insurance provider's decision not to conduct an IME, and its reliance on reviewing physicians' opinions as opposed to her treating physician.  The case stands for the proposition that it is not necessarily arbitrary and capricious not to conduct an IME, but adds little to reviewing the determination in a case that credited reviewing opinions where an IME was conducted that actually concurred with the treating physician and confirmed plaintiff's disability.

Finally, in <u>Rivera v. Bd. of Trs., Building Serv. 32B-J Pension Fund</u>, Rivera worked as a building service employee and claimed disability benefits due to back problems. No. 02-CV-7844, 2003 U.S. Dist. LEXIS 12640 (S.D.N.Y. July 28, 2003).  The court held that the administrative denial was not arbitrary and capricious in denying benefits under the definition of disability in Rivera's policy, which read "unable to engage in any further employment or gainful pursuit." <u>Id.</u> at 13.  Again, the combination of physician opinions weighed by the administrator was different and is not helpful on the instant facts.  Unlike the plaintiff here, an independent medical examiner found Rivera to be "perfectly well," and both the Worker's Compensation Board and the Social Security Administration concluded he was capable of work related activity. <u>Id.</u> at 4,11.

**D. Remedy**

Plaintiff argues that if it is determined that Liberty was arbitrary and capricious in denying her claim, the action should not be remanded a second time for further administrative processing.  A remand is necessary in order to fully develop an incomplete record of decision.  As plaintiff asserts, the record is sufficient but the denial was arbitrary and capricious.  Considering the thorough review and arbitrary result, a remand would be a "useless formality." <u>Zuckerbrod v. Phoenix Mut. Life Ins. Co.</u>, 78 F.3d 46, 51 (2d Cir. 1996) (citing <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066, 1073-74 (2d Cir. 1995)).

Plaintiff will be awarded back benefits through the end of the "own" occupation period of her policy.  Plaintiff has not offered evidence or argued that she is disabled from "any" occupation which is the requirement for receipt of benefits after the 24 month "own" occupation period.  Benefits will not be awarded beyond that period, but the policy is

reinstated to the extent that having been entitled to own occupation benefits through the own occupation period, she was also entitled to submit a claim for the "any" occupation benefits.

Plaintiff's entitlement to other employee benefits hinged on her continued eligibility for LTD benefits.  The termination of LTD benefits triggered termination of those other benefits - for example, discounted group rates on other insurance policies.  Having concluded that the denial of LTD benefits was improper and the resulting termination was also, plaintiff is entitled to reimbursement of out-of-pocket expenses to cover the lost benefits during the remaining months of the "own" occupation period.

## IV.  CONCLUSION

Liberty's denial of LTD benefits was arbitrary and capricious in that it lacked substantial evidence to discredit plaintiff's subjective complaints. The surveillance videos and FCE were not substantial evidence on the instant facts.  Liberty arbitrarily relied on reviewing physician's opinions considering that the IME and her treating physician deemed plaintiff disabled and the reviewing physicians relied on the surveillance videos and FCE.

Accordingly, it is

ORDERED  that

1.  Defendants' motion for summary judgment is DENIED;

2.  Plaintiff's motion for summary judgment is GRANTED;

3.  Plaintiff is awarded the remaining benefits owed during the 24 months of the "own" occupation period;

4.  Defendants are ordered to reinstate the policy the extent that plaintiff may submit a claim for benefits under the "any" occupation provision;

5.  Plaintiff is awarded reimbursement of out-of-pocket expenses to cover the lost employee benefits she was entitled to during the remainder of the 24 months of the "own" occupation period.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   May  2, 2005
          Utica, New York.